WEATHERLY et al. v. AMERICAN AGRICULTURAL CHEMICAL CO.

Middle Section. April 25, 1933.

Petition for Certiorari denied by Supreme Court, December 15, 1933.

Seay, Stockell & Edwards, of Nashville (Sullivan & Cromwell, of New York City, of counsel), for appellant.

J. C. Voorhies, of Columbia, and Pitts, McConnico, Hatcher & Waller, of Nashville, for appellees.

DeWITT, J. In their bill in this cause, Mrs. Eva Weatherly, Mrs. Sue Curry, and her husband, G. T. Curry, the owners of certain lands containing phosphate rock, sought a construction under the Uniform Declaratory Judgment Act (chapter 29 of the Pub. Acts of 1923) of a certain lease or mining contract entered into between the complainants and the defendant on November 21, 1920. The complainants prayed for a declaration by decree (a) that the obligation of the defendant to pay to complainants the sum of $2,500 a year, when it is not carrying on mining operations on said property, does not relieve the defendant of the obligation to mine from said property all the phosphate material of the specified grade existing therein; (b) that the defendant is obligated by the contract with the complainants to mine from said property all the phosphate material of the grade of seventy-two per cent bone phosphate of lime, or better, in or under said property, within the time specified in said contract; (c) that the defendant is answerable to complainants in damages for any waste or loss occasioned by improperly mining or removing from said property any phosphate material, or by improperly preparing same for market, or by handling or preparing the same different from or contrary to the methods prevailing in this territory from time to time.

The chancellor sustained the first two of said propositions, and deemed it beyond the scope of the suit to adjudicate the question of breach of contract or right to damages. The defendant appealed.

The defendant corporation was engaged in the business of mining phosphate rock and manufacturing fertilizer. It purchased a tract of several hundred acres of C. D. Loveless, adjoining the land of complainants, on which tract the prospecting had indicated a possible 285,000 tons of phosphate rock of seventy-two per cent bone phosphate of lime. It had secured options for leases on complainants' land and three other adjacent tracts known as the John Jamison, the Margaret Jamison, and the Fitzgerald lands. Prospecting indicated a possible 200,000 tons of phosphate rock of seventy-two per cent bone phosphate of lime, or better, underlying complainants' land, known as the Weatherly property. After it purchased the Loveless tract, it exercised its option and leased from the complainants their tract. The lease was entered into for a period of twenty years from and after November 21, 1920, "for the purposes and upon the terms" as follows:

"The foregoing lease is coupled with the following grants, stipulations, conditions, and subject to the following reservations and restrictions. That is to say, the party of the first part does hereby grant to party of the second part, its servants, agents, and employees, and the successors and assigns, the sole and exclusive right to enter upon said leased land for the purpose of mining and to mine and remove during said period of twenty years the phosphate rock and phosphate-bearing material from said land, with the right to remove the overburden existing on said land above the phosphate, and the right to mine and remove all the phosphate rock and phosphate-bearing material existing in, on, upon said land, which contains seventy-two per cent or better of bone phosphate of lime, and to remove, and transport said phosphate and the material with which it is mixed over and across said leased lands to the plant to be erected on the land of second party, known as the Loveless tract, there to be prepared, and for the purpose of entering upon said premises and mining and removing, said phosphate therefrom, said Grantee shall have the right to do any act or thing necessary for the purpose of mining, removing, and preparing said phosphate in a necessary or proper manner, and in so doing may use the methods from time to time prevailing."

The said lease further grants to the second party (the defendant), "certain rights of way across the leased premises for wagon roads, tram roads, or other ways, together with the right to lay and maintain pipes to be placed twelve inches below the surface across the premises described in the lease to lands recently purchased by the defendant from C. D. Loveless, and to establish a pumping station upon said premises to be located near the bridge on the Spring Hill road where it crosses Carter's Creek, and to take from the creeks and waters upon or bordering the said premises such water as it may need for the purpose of operating its plant upon the lands so purchased of C. D. Loveless and to cause said water to flow through said pipe lines."

The lease further granted to the lessee, its successors, and assigns, as an easement, "a right of way to establish and maintain a railroad or tram line across said leased premises as hereafter set out, with the right to lay ties and rails, and to operate over the same engines, cars, and trains."

Said lease further provides:

"Now in consideration of the foregoing grant, rights, privileges and easements, and as a rental for said leased premises, party of the second part agrees to pay said first parties, their heirs, personal representatives, or assigns, a royalty of one dollar per long ton of 2,240 pounds for all phosphate rock or phosphate-bearing material, analyzing seventy-two per cent or better of bone phosphate of lime, the tonnage to be determined upon the finished product as shipped

from the plant of Grantee, to be constructed on the land acquired by it from C. D. Loveless, adjoining the lands of the Grantor; railroad weights to govern and determine settlements; payment of royalties to be made after the phosphate is shipped, settlement to be made quarterly on the first day of January, April, July, and October of each year, for all phosphate shipped the previous quarter, and a tonnage of ten thousand a year is to be mined while working the lands herein described, and a minimum payment of twenty-five hundred dollars per year to be made by Grantee as lessee as rental while no mining thereon is being done. Such payment of $2500 per year to be applied against royalties on rock as subsequently mined and shipped. Such payment of twenty-five hundred dollars per year not to extend beyond the time when all mineable and merchantable rock of seventy-two per cent B. P. L. or better shall have been mined and shipped from the premises described.''

The defendant expended a very large sum of money in building its washing plant on its Loveless tract, and pumping station and power house on the corner of complainants' property adjacent to Carter's creek, and in laying the pipe line to bring water therefrom to the washing plant. It was an essential purpose, in obtaining leases on the Weatherly property, as well as the Jamison properties, to secure water rights to Carter's creek, which could not be had without leasing these properties, as well as to secure an easement for the purpose of laying pipe lines across the Weatherly property from the pumping station to the washing plant. Thus the aforesaid contract was entered into in order to obtain water rights and other easements and mining privileges.

The defendant mined the phosphate rock on the Loveless property before beginning the mining upon the Weatherly property. It mined from the Loveless property practically all of the phosphate rock thereon of the grade specified, but obtained only about twenty-five per cent of the amount of phosphate rock which was estimated to underlie those premises. It did not begin any mining on complainants' property until December, 1927, more than seven years after the beginning of the lease, but it paid to the complainants the sum of $2.500 for each of said years, and, after it began mining operations on complainants' property, it paid to the complainants a royalty of one dollar on every ton mined, after deducting therefrom the amount which it had paid to them at the rate of $2,500 a year. The defendant mined the phosphate rock on complainants' property from December, 1927, until May, 1931, when it discontinued such mining operations. Altogether it mined on complainants' property 84.031.58 tons of phosphate rock, for which it paid to them $84,031.58. After discontinuing such operations on complainants' property, the defendant continued paying to them the sum of $2,500 a year, which was accepted by them, and it proposes to continue paying to complainants the sum of $2,500

each year until the end of the term of twenty years provided for in the lease. It has abandoned the whole operation, having lost about $379,000 thereon, and does not intend to mine any more phosphate rock on the complainants' property. It assigns as the cause of the loss and the consequent discontinuance of operation a poor quality in grade of the phosphate rock on both its Loveless tract and the Weatherly tract.

For the complainants it is insisted as follows:

(a) That the contract made November 21, 1920, between the complainants and defendant constituted a purchase by the defendant of all the phosphate material, in, on, or under complainants' said lands, of a grade of seventy-two per cent bone phosphate of lime, or better, and, as defendant had thus bought the same, there was necessarily to be implied an agreement to mine or pay for all of the phosphate rock of seventy-two per cent bone phosphate of lime on the premises within the term of twenty years specified within the lease; (b) that the defendant is obligated not only to pay to the complainants the sum of $2,500 a year when it is not carrying on mining operations on said property, but also to mine from said property all of the phosphate material of seventy-two per cent bone phosphate of lime, or better, existing therein or thereunder.

For the defendant it is insisted as follows: (a) That the contract entered into between complainants and defendant was a contract of lease and was so designated by the parties, that it conferred upon the defendant certain rights, privileges, and easements in complainants' property for the period of twenty years, among them water rights and other easements enjoyable, whether the property was mined or not, with the right or privilege to conduct mining operations on the property for a period of twenty years; (b) that the lease did not constitute a sale of all of the phosphate rock of seventy-two per cent bone phosphate of lime, or better, underlying complainants' property, binding the defendant to mine and pay for all of the said phosphate of such grade thereon; (c) that there is no express covenant in the lease requiring the defendant to mine the property and remove all the phosphate rock thereon, and no obligation to mine resulted by necessary implication from the language of the instrument; (d) that the covenant in the lease requiring the defendant to pay to the complainants the sum of $2,500 a year, "to lessee as rental while no mining thereon is being done" and also other provisions of the lease are inconsistent with an implied covenant to mine. In a carefully prepared opinion, the chancellor stated the pivotal issue as follows:

"If the lease is to be interpreted as giving to the defendant the option to pay $2500 a year in the way indicated in said lease, or not to mine upon the payment of said sum, then the defendant's construction of said lease contract is not debatable, as the ground rental for the period of twenty years is a substantial rental for the

premises. If, on the other hand, the defendant did not have the option to pay the $2500 a year and thereby cease to mine, then the contention of the complainants is not debatable under the rules prescribed by the various courts in such lease contracts.''

The chancellor adopted the latter view, finding, from a consideration of the condition and circumstances surrounding the parties at the time of the execution of said lease, and their subsequent acts in dealing with the matters embraced therein, that all the parties contemplated that there would not be an immediate mining begun on complainants' property and not, perhaps, until the mining was completed on defendant's Loveless property, and that in order that during such period the complainants might receive a reasonable amount, the provision for payment of $2,500 a year was placed in said contract in order to satisfy all parties until actual mining would be begun; that the defendant was to pay this amount until it actually should begin mining on complainants' property, and when such mining was begun the amount of rental paid would be repaid in tonnage of ore, which continued the payment to complainants of the amount of royalty agreed on upon the ore mined, and, further, that when all this ore should be mined, the payment of $2,500 should cease—the interpretation thus being that said $2,500 a year rental as termed in said contract was not for twenty years, but only until the defendant should begin to mine and continue when not mining until all the ore contracted for should be removed.

The chancellor, in reaching said conclusions, considered as impressive the provision in the contract obligating the defendant when actually working the complainants' land to mine as much as 10,000 tons a year, and calculating that under the prospecting before the parties contracted, this would consume twenty years, the estimated tonnage being 200,000 tons. He was of the opinion that mining and removing the ore was the sole purpose of the lease, that all of it might have been mined within a period of perhaps six or seven years, so that when all of the ore of the specified grade should be removed, it necessarily followed, without the expression in the lease, that the payments of $2,500 a year were not to be made.

In general, although a mining lease is a conveyance of an interest in the land, there is a clear distinction between an absolute conveyance of the mineral in place and the grant of a mining right to enter upon the land and convert the mineral into personalty and dispose of it. In case of an absolute sale there is a severance of the title to the realty; in case of a lease there is not, although the mining right entitled the lessee to extract every particle of the mineral. 40 C. J., 992; Chandler v. French, 73 W. Va., 658, 81 S. E., 825, L. R. A., 1915B, 561. In case of a lease the surface owner owns the whole land and everything in place in it, and the lessee simply has a right to use the land for a purpose, a terminable right, which may be long

or short in years; that is, a mere chattel real, issuing out of land, but constituting a distinct estate, a valuable one as property. Where this view obtains, it is held that a grant of a privilege of taking ore from another's land for an agreed price per ton is not a sale of all the ore still in the land, notwithstanding a stipulation that the privilege is to be given to no one else. 18 R. C. L., 1187, and cases cited. In the instrument before us the grantors expressly undertook to "lease and let" to the defendant for the period of twenty years certain lands "for the purposes and upon the terms" thereinafter expressed. The sole and exclusive rights were granted "to enter upon said leased land for the purpose of mining and to mine and remove" the phosphate rock, "and to transport said phosphate and the material with which it is mixed over and across said leased lands," etc. The lands are many times referred to as "leased lands," and the instrument as a "lease contract." The royalty of one dollar per ton is stipulated for "as a rental for said leased premises." The minimum payment of $2,500 per year, to be paid while no mining thereon is being done, is to be paid "by grantee as lessee as rental." It is evident that the parties did not intend that the instrument should operate as a sale of the mineral in the land. Not only did they term it a lease, but they stipulated that royalties should be paid after the mining and removal of the rock. Of course, it was a sale of such as would be mined and removed, but as to the remainder of the rock, it was not a sale unless it should be likewise mined and removed.

In Morris v. Messer, 156 Tenn., 54, 299 S. W., 782, 783, involving a contract of a landowner for drilling and operating for oil and gas for five years "and as much longer as oil and gas is found," upon a royalty of one-eighth of the oil and $50 a year for the gas, it was said: "These contracts are of peculiar character. Although called leases they vest no title in the lessee to the oil and gas in place before extraction, and they give to the lessee only a contingent right of possession of the land for the purpose of exploration. 'After oil or gas is found, however, the right to retain possession for the purpose of producing becomes a vested right under the terms of the lease, and if the oil or gas is reduced to possession, title thereto as personalty becomes vested in the lessee.' 40 C. J., 1060." "The requisites and validity of an oil and gas lease are ordinarily controlled by the same rules that govern the requisites and validity of other mineral leases." 40 C. J., 1047.

All this discussion is but preliminary to the real question. Is the defendant obligated, either expressly or impliedly under its contract, to mine from the complainants' property, within the contract period of twenty years, all the phosphate of the grade of seventy-two per cent bone phosphate of lime?

The complainants concede that they could not terminate the con-

tract and maintain an action of ejectment against the defendant lessee so long as it pays the sum of $2,500 each year. This is not a suit to establish a forfeiture, but completely the converse—a suit to declare an obligation to perform fully the undertaking alleged to have been entered into. In construing the contract, parol evidence of the circumstances surrounding the parties may be looked to for aid, but not for the purpose of contradicting the writing. Litterer v. Wright, 151 Tenn., 210, 268 S. W., 624; Somerville v. Gullett Gin Co., 137 Tenn., 509, 194 S. W., 576; Jackson v. Texas Co., 10 Tenn. App., 235. Evidence of the situation of the parties and their surroundings, of the motives which induced the agreement, and the object and purpose designated to be effected by it, may be considered in order to ascertain the intention of the parties, if it does not tend to contradict the language of the written instrument. Knoxville, C., G. & L. Railway Co. v. Beeler, 90 Tenn., 548, 18 S. W., 391.

In McGannon v. Farrell, 141 Tenn., 631, 214 S. W., 432, the rule was applied that any oral promise to do or refrain from doing something affecting the property about which a written contract is made and executed between the parties will not be enforced, not because the parties should not fulfill their promises and their legal and moral obligations, but because the covenants and agreements being promissory and contractual in their nature and a part of or collateral to a principal contract, the entire agreement between the parties must be deemed to have been merged in the writing. Consequently, in the instant case, testimony of the complainants that they contemplated or understood, before the contract was executed, that the defendant was to mine all of the specified mineral on the property, cannot be considered if it is contradictory of the written instrument.

From their prospecting the Loveless and Weatherly tracts, the defendant's representatives estimated that on the Loveless land there was approximately 380,000 tons of mineable and merchantable phosphate of the grade specified, and on the Weatherly property there was approximately 200,000 tons of such phosphate; that this was sufficient to warrant the operation, but that the quantity on the Weatherly property alone was not sufficient. The estimates as to each property proved to have been greatly excessive, but this is not controlling. As aforesaid, the lease of the Weatherly property was essential to the operation on the Loveless property which the defendant purchased. Both properties had been mined by the Virginia-Carolina Chemical Company, leaving quantities of phosphate rock of seventy-two per cent of bone phosphate of lime or better, and the evidence shows that, when the defendant discontinued its operation, there was left on complainants' land a considerable quantity of phosphate rock of this grade, although some of it was poor in quality because of chemical changes due to exposure from the previous mining, and because of the high content of iron and alumium. But

these are not determinative matters on the issue as to obligation to continue mining. When the contract was executed, it was understood that mining on the Weatherly property would not immediately begin, as the improvements had to be erected and the first mining was to be done on the Loveless tract. There is no direct evidence that the payments of $2,500 as rental each year were intended only for the period until mining should be begun on the Weatherly tract. The chancellor's conclusion that this was the intention was inferred as follows:

"The proper interpretation of the $2,500 rental is meant that the defendant was to pay this amount until it actually begun mining on the properties of complainants, and when such mining was begun, the amount of rental paid was to be repaid in tonnage of ore, which continued, or rather procrastinated, the payment to complainants the amount agreed on of the ore mined, and further, that when all this ore was mined, the payment of the $2500 ceased, thereby being interpreted that said $2500 rental as termed in said contract, was not for twenty years, but only until the defendant begun to mine and continue when not mining, until all the ore contracted for was removed."

The contract with the complainants was drafted by the defendant's attorney, and, of course, if it contains ambiguous language, such language will be construed most strongly against the defendant. Villines v. Parham-Lindsey Grocery Co., 6 Tenn. App., 254. But the language of this contract is plain. The question is not one of interpretation of the words, but it is one of proper conclusion as to the legal consequences of the undertakings plainly specified; and we are guided by the application of rules to cases most nearly analogous, although in the end each case must be determined upon its own facts and circumstances, there being many differentiating elements in such cases.

The contract before us contains no express provision obligating the defendant to mine all of the specified mineral during the terms of the lease. The obligations specified in terms are: To pay a royalty of one dollar per ton "for all phosphate rock or phosphate-bearing material" of the grade specified; to mine 10,000 tons a year while working the land; to pay the royalties at certain intervals after the phosphate is shipped; and to make a minimum payment of $2,500 per year as rental while no mining is being done, to be applied against royalties as subsequently mined and shipped. The question of obligation to mine any rock after the payment of said rental must be determined from the whole instrument.

What was granted in the instrument was "the sole and exclusive right to enter upon the land for the purpose of mining and to mine and remove during said period of twenty years, the phosphate rock, and phosphate-bearing material;" "the right to remove the over-

burden; the right to mine and remove all the phosphate rock and phosphate-bearing material" of the specified quality; "the right to remove and transport the same;" "the right to do any act or thing necessary for the purpose of mining, removing, and preparing said phosphate in a necessary or proper manner, using the methods from time to time prevailing; the rights of way, rights to establish pumping station, lay and maintain pipes, and to take water from creeks and waters upon or bordering upon the land."

In none of these provisions was the defendant expressly obligated to mine and remove from the complainants' premises all of the specified mineral within the term of twenty years. Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. Such an agreement may result as a legal inference from the facts and circumstances of the case. 6 R. C. L., 587; 13 C. J., 241. "Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without the assent of the party bound, on the ground that they are dictated by reason and justice and which are allowed to be enforced by an action ex contractu." 13 C. J., 244. With these definitions in mind, we must determine whether or not such an agreement as is insisted upon was implied.

The doctrine of duty upon the lessee of minerals to develop the leased premises to the mutual profit of himself and the lessor by exercising reasonable diligence has been applied in many cases upon the theory of implied contract and upon principles of equity and justice; but the court can declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. And before a covenant will be implied in the express terms of a contract, or in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, or that it is necessary to imply such covenant in order to give effect to the purpose of the contract as a whole. Freeport Sulphur Co. v. American Sulphur R. Co., 117 Tex., 439, 6 S. W. (2d), 1039, 60 A. L. R., 890, citing Grass v. Big Creek Development Co., 75 W. Va., 719, 84 S. E., 750, L. R. A., 1915E, 1057; 13 C. J., 558; 15 C. J., 1214. In this Texas case the title to the property was conveyed in fee simple subject to the payment of a royalty. The tendency of modern decisions is not to imply covenants which might and ought to have been expressed if intended. 15 C. J., 1212, and cases cited. In Belle-Mead Lumber Co. v. Turnbull, 77 W. Va., 349, 87 S. E., 382, 384, the rules were soundly stated: "Implied covenants can be justified only on the ground of legal necessity. It is not enough merely to say fairness, prudence, or wisdom demanded

it under the circumstances. It must be necessary to the operation of the contract, or of words found in it, or effectuation of the intention of the parties, made manifest by their words."

In 40 C. J., 1020, a textual statement is as follows:

"In the absence of a provision to the contrary, the law implies a covenant on the part of the lessee to begin operations within a reasonable time and continue to develop and work the mine in a proper manner and with reasonable diligence, so that the lessor may receive the compensation or income contemplated when the lease was made, where under the terms of the lease the right to mine is granted in consideration of the reservation of a certain proportion of the product to the lessor, or the rent reserved is a certain fixed proportion of the price of the product which the lessee might get and sell, or a royalty on the amount of mineral mined."

The cases cited in support of this text were cases to which the rule would have special and necessary application, either because of express covenants or total lack lack of protection to the lessors, as in very long leases for prospecting and development, upon merely nominal considerations and without minimum rents or royalties. A typical case of the latter kind was Killebrew v. Murray, 151 Ky., 345, 151 S. W., 662, cited in behalf of complainants. Such cases are too remote by comparison for guidance in determining the issue here involved. On the other hand, the following textual statement is found on page 1029 of 40 C. J.:

"It is usual for mining leases, especially in the coal mining regions, in reserving a royalty to the lessor, to contain a provision for the payment to the lessor of a sum variously known as a 'minimum royalty' or a 'dead' or 'sleeping rent, that it, to fix a minimum amount to be mined or a minimum royalty to be paid in any event within certain fixed periods, in which case the amount so fixed must be paid, although no mining is done or the royalty at the agreed rate on what is actually mined is less than the minimum, such royalty being considered liquidated damages and not a penalty. The exact obligation and rights of the lessee under such a provision depend upon the terms of the particular lease and supplemental agreements."

Among cases cited in support of this statement is Coal Creek Mining Co. v. Tennessee Coal, Iron & R. R. Co., 106 Tenn., 651, 62 S. W., 162, 168, which was a suit to collect royalties under leases for periods of years, obligating the lessee to mine certain minimum amounts of coal each year, reserving a royalty on each bushel mined, and in event of failure to mine the minimum amounts of coal, to pay to the lessor each year, as liquidated rent, such sum of money as added to the amount of royalty paid for such year, as should be equal to the sum of $8,000. The Supreme Court of Tennessee held that this was a valid contract for liquidated damages, among other things,

quoting with approval the rule that "when the damages are in their nature indefinite and uncertain, and the parties have mentioned a specific sum of liquidated damages, it will be so regarded, unless it be greatly disproportioned to any probable estimate of damages."

Two Tennessee decisions are relied on by the complainants. The crucial issue in each case was as to abandonment of the lease by the lessee. They are as follows:

Charleston, S. C. Mining & Mfg. Co. v. Chemical Co., 126 Tenn., 18, 150 S. W., 1143, 1147. The lease was for twenty years, the lessee to pay ten cents per ton of phosphate rock mined and removed, with a provision for a minimum royalty on 3,600 tons, or $360, each year, and with a clause of forfeiture upon thirty days' notice in the event of failure to pay the minimum royalty when due. After the first year, no mining was done and no royalties were paid for a period of ten years. It was held that forfeiture for nonpayment of royalties accrued should be denied because of failure to demand the same on the day when due and on the premises; but under the facts the lease was declared to have been abandoned by consent of the parties. As to the lessee, the court said: "It was his duty, if he accepted the lease, not only to pay the minimum royalty semiannually, but to actively and in good faith mine the rock thereon to the full extent its quality and quantity justified. This was the implied obligation of the lease [lessee], in order that the lessors might derive their reasonable expectation in the enjoyment of their property. He had no right to merely hold the rights of the lessee under the lease, without giving full force to those of the lessor." This was said with direct reference to the question of intention of the lessee to abandon the lease.

Bates v. Fertilizer Co., 144 Tenn., 32, 229 S. W., 153, 156. The bill was filed to collect royalties under a mining lease for a period of five years and as long thereafter as phosphate and phosphate-bearing rock might be found on the land in paying quantities. The lessees were obligated to pay a royalty of one dollar per ton on each car shipped, but in any event a minimum royalty of $100 per month was to be paid during the life of the lease. The lessees were further obligated "to mine and ship said phosphate and phosphate-bearing rock as they come to the same, taking it clear as they go, lump and disintegrate alike." After mining about 1,000 tons, all mining was discontinued, but the minimum royalty was paid until some time before the bill was filed, when no further payment was made and no reason given therefor. The principal defense made was that the assignee of the lease had, as of right, forfeited the lease under a clause of forfeiture therein. The court overruled this defense on the ground that the provision for forfeiture was for the sole benefit of the lessor, who might assert the forfeiture or forbear to do so. The lessee was not allowed to set up its own default as a cause for cancellation.

This in itself was a complete answer to the contention of the defendant, but the court said further:

"We think, by the terms of the lease, the defendant was obligated to mine the phosphate and phosphate-bearing rock from said area of land as long as it could be found in paying quantities, and that if this could not be done within the five years, the time mentioned in the lease, then the defendant was obligated to continue mining until the phosphate and phosphate-bearing rock 'in paying quantities' were entirely removed. We think the lease obligated the defendant to actively and in good faith mine said minerals from the land until the entire deposit was removed, provided they could be found 'in paying quantities.' We think that such was the contemplation of the parties clearly appears from the terms of the lease."

In the contract before us a definite term is specified, without any further provision for working as long as the mineral is found in paying quantities, which was evidently treated as creating expressly an obligation in Bates v. Fertilizer Company, supra. In neither of these Tennessee cases was there any express recognition in the contract that the lessee might for some period or periods be not working the property. In the instant case the parties contemplated such periods and stipulated for a "sleeping rent" as liquidated damages, the amount being substantial. This appears twice in this contract—in the restriction of obligation to mine 10,000 tons a year to the periods when the lands were being worked, and in the obligation to pay $2,500 a year while no mining would be done. These are elements of material distinction.

In Freeport Sulphur Company v. American Sulphur R. Co., supra, attention is called to the rule in England that no obligation to work a mine is implied merely because a royalty is reserved; but it is stated that the American courts have liberalized the rule, especially in sales of minerals and mineral rights in oil and gas leases, and have found an implied covenant for diligent and reasonable development operation in leases which make the lessor's compensation dependent upon development and operation. This statement has special reference to such leases as that involved in the cases cited in support of the text hereinbefore quoted from 40 C. J., 1020.

In Wheatley v. Westminster Brymbo Coal Company, L. R., 9 Eq., 538, 17 English Ruling Cases, 827, involving a lease of a coal mine, reserving a minimum rent of 720 pounds, to be increased to 1,000 pounds in case there should be pits sunk upon the estate, with a royalty above all coal gotten beyond a certain quantity, and with covenant to work the mine uninterruptedly, efficiently and regularly, according to the usual or most improved practice, it was held that so long as the minimum rent was paid the lessee cannot be compelled to work the mines at all, for if the lessors desired to secure the working of their mines beyond the amount of the sleeping rent, they must

in the lease insert covenants which throw that obligation on the lessee. This ruling was reaffirmed and applied by the same learned vice chancellor in Simpson v. Ingleby, Law Times Reports, 26 N. S., 543. This principle was applied in McIntyre v. McIntyre Coal Company, 105 N. Y., 264, 11 N. E., 645, and Niles Land Company v. Chemung Iron Company (C. C. A.), 234 Fed., 294, 297—cases quite analogous to the instant case upon their facts. Niles Land Company v. Chemung Iron Company was decided by the Circuit Court of Appeals for the Eighth Circuit. It involved an iron mining lease for a term of fifty years, in which the lessee covenanted "to work the mine or mines now or hereafter discovered on said lands in a good workmanlike manner during the existence of this license," and to pay the lessor a royalty of twenty-five cents per ten on all iron ore mined, with the further obligation to pay a ground rent of $18,750 per year after the first year during the continuance of the lease, with the provisos that, if the royalty paid in any year should equal or exceed the ground rent for that year, it should be in lieu of the ground rent, and, if less, the lessee should pay the difference, and that all sums paid as ground rent in any year should be credited on the royalty, which might be in excess of said ground rent in any succeeding year or years. The suit was brought to enforce a forfeiture of the lease on the ground that the lessee failed to keep and perform one of the covenants of the lease, as a consequence of which the right of forfeiture accrued. This was alleged to be a failure to work the mines. The court held that the continuous operation of the mine was not a requirement to secure to the lessor the payment of royalties which were to measure the rent reserved as consideration for the lease; that if payment of royalties were the only provision for the payment of rent, the argument to the contrary would be very persuasive, for, unless the mine should be operated, no ore would be produced, and, of course, no royalty would be payable. But a substantial amount was agreed to be paid in any event by the lessee, whether the mine be worked or not, and, if worked so as to produce royalties, such royalties were to be credited on the ground rent obligation, and, if the royalties were equal to or in excess of the ground rent, the same were to be in lieu of ground rent. It was determined that the intention of the parties to the lease was that the payment of ground rent absolutely and in any and all events was the substantial consideration of the lease; that the intention was to commute the minimum uncertain output of the mine and the royalties to result therefrom to a certain and definite sum designated as ground rent, the provision for ground rent being in other words the agreed substitute for actual and continuous operation. Emphasis was also laid upon the fact that the parties by the continuous course of dealing for ten years or more, with full knowledge of all the facts and circumstances, treated the lease as not obligating the lessee to continuous

mining operations; and this, in the opinion of the court, amounted to a practical construction of the covenant in question.

The terms and provisions of the contract before us are not precisely like those involved in any other case which we have been able to find, but they are most nearly like those involved in the two cases just cited, and the aforesaid English cases; especially as to provisions for working the land and minimum payments per year, and the purposes thereof, in the failure to operate in whole or in part.

It is manifest that the parties to this contract did not contemplate a continuous working; that although there was an estimate of 200,000 tons of phosphate rock in complainants' property, this was uncertain. If there were 200,000 tons and 10,000 tons per year were mined and removed, this, of course, would consume the supply; but it was contemplated that the lessee would not work the property during the whole term of twenty years, so that the lessors were to receive, and did receive, a substantial compensation for the period of failure to work the property. This, of course, was only one-fourth of the royalties to be received per year, while the work would be carried on; nevertheless, there is a plain recognition of the fact that the work would not be continuous. We do not think that the conclusion is warranted that it was the intention of the parties that the rental of $2,500 was to be paid only until operation should begin, and then that operations must be continuous during the balance of the term so as to mine and remove all of the phosphate mineral. The provision, "such payment of $2500 per year to be applied against royalties on rock as subsequently mined and shipped," was literally complied with, for after the lessee began mining its payments of $2,500 per year were applied against the royalties on the rock which it mined and shipped. If the defendant, after discontinuing its operation, had decided to resume operations, this provision would still apply. If the parties had contemplated that the payment of $2,500 per year was to be made only until mining operation should begin, they would have said so plainly in the contract. The language of the contract is too comprehensive to admit of such a limited interpretation. It was intended to be applicable to whatever situation and conditions might exist during the entire period of twenty years.

Under the complainant's construction of the lease, the defendant would be bound to mine all phosphate of seventy-two per cent bone phosphate of lime or better on the land, whether or not it is mineable, merchantable, or profitable. In the absence of such express provision, such obligation would be beyond the limits of the rule of implied duty applied in the cases which are relied on for the complainants. In Charleston, S. C. Mining & Manufacturing Company v. Chemical Company, supra, the obligation of the lessee was stated: "to actively and in good faith mine the rock thereon to the full extent its quality and quantity justified." In Bates v. Fertilizer

Company, supra, the obligation to mine was limited to finding the mineral "in paying quantities." These are the limits of reasonable performance under an implied obligation. Where the lessee has done everything that a reasonably prudent person would have done under the circumstances, as a matter of law, he has used due diligence, and, conversely, where he has failed to exercise such business prudence, he has not used due diligence. See note to Kachelmacher v. Laird, Ann. Cas., 1917E, page 1141, and cases cited. If the test were that of mutual profit, as employed in some cases, it is abundantly met in this case; for the complainants will have received more than $100,000, while the defendant will have lost much more than that sum.

We are therefore unable to concur with the learned chancellor, and the decree appealed from will be reversed. A decree will be entered declaring that the defendant is under no obligation further to mine the mineral on complainants' land under the contract. The costs of the cause will be adjudged against the complainants and the surety on their cost bond.

Faw, P. J., and Crownover, J., concur.