IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 4, 2005 Session

## RIDGELAKE APARTMENTS v. HARPETH VALLEY UTILITIES DISTRICT OF DAVIDSON AND WILLIAMSON COUNTIES

Appeal from the Chancery Court for Davidson County
No. 02-2395-I     Irvin Kilcrease, Jr., Chancellor

No. M2003-02485-COA-R3-CV - Filed April 8, 2005

Harpeth Valley Utilities District of Davidson and Williamson Counties is a supplier of water and sewer services with charges for such services being based on gallonage of water measured by a water meter installed where the water main supply line joins the water line owned by the customer. Ridgelake Apartments is an apartment complex served by both a main residential water meter and an irrigation meter. Water supplied through the irrigation meter is not subject to sewer charges, but water supplied through the main residential meter is subject to such charges. Over a period of years, leaks developed in the water lines owned by Ridgelake on the Ridgelake side of the main residential water meter. Ridgelake sought reimbursement of sewer charges for water lost in these leaks on the basis that such water did not enter the sanitary sewer system. The trial court granted summary judgment to the Utility District, and we affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Adam O'Lyddy Knight, Nashville, Tennessee, attorney for appellant, Ridgelake Apartments.

Robert Edmond Parker, Sara Kathleen Wilson Smith, Nashville, Tennessee, attorneys for appellee, Harper Valley Utilities District of Davidson and Williamson Counties.

### OPINION

Harpeth Valley Utilities District of Davidson and Williamson Counties is a governmental entity organized pursuant to the Utility District Law of 1937 (Tenn.Code Ann. § 7-82-101 *et seq.*). The Utility District furnishes water and waste water services to several counties in Middle Tennessee, including a portion of Western Davidson County encompassing the Bellevue area. Ridgelake Apartments is an apartment complex located in the Bellevue area of Western Davidson County.

The Utility District supplies water to its customers for both regular usage and for irrigation usage. These usages are separately metered because water used for irrigation purposes does not enter the sanitary sewer system as waste water such as happens with water passing through the regular service meter. Consequently, water passing through the irrigation meter is not subject to sewer service charges while water passing through the regular service meter is subject to sewer service charges, with both water and sewer charges being based upon the number of gallons of water passing through the regular service meter.

Ridgelake Apartments is a very large apartment complex, and since at least 1986, has had a separate irrigation meter to measure water used for landscaping and maintenance purposes, which does not return to the sanitary sewer system. Water passing through the irrigation meter is not involved in this case.

At some time between the Fall of 2000 and late 2001, Ridgelake discovered several leaks in its water lines on its property "downstream" from its regular water service meter. Ridgelake then repaired these leaks, but asserted that for the past several years it had been overcharged for waste water services because water that had passed through the regular service water meter and then leaked from its pipes had never reached the sanitary sewer system. Ridgelake reasons that it should be reimbursed for sewer charges on water that passed through the regular service meter but leaked from its pipes. The Utility District declined to consider the claim of Ridgelake on the basis that the Utility District was not responsible for leaks occurring in the Ridgelake lines "downstream" of the regular water meter and that Ridgelake asserted no complaint about the calculation of water entering its lines as calculated by the regular service water meter.

Ridgelake filed this Complaint asserting that it was entitled to reimbursement for water lost through these leaks for the 36-month period preceding discovery of the leaks pursuant to the terms of Tennessee Code Annotated section 28-3-302. After discovery was complete, the Utility District filed a Motion for Summary Judgment which the trial court granted without comment. Ridgelake filed a timely appeal.

The well-known general standard for appellate review is set forth in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). Therein, it is held:

> In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, courts in this state have indicated that the question should be considered in the same manner as a motion for directed verdict made at the close of the plaintiff's proof, i.e., the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn.1991); *Poore*, 666 S.W.2d at 49; *Dunn*, 833 S.W.2d at 80; *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276, 279 (Tenn.App. 1977); *Taylor*, 573 S.W.2d at 480. Then, if there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied. *Poore*, 666 S.W.2d at 49. ("[I]f the mind of the court entertains any doubt whether or not a

genuine issue exists as to any material fact it is its duty to overrule the motion."); *Dooley v. Everett*, 805 S.W.2d 380, 383 (Tenn.App.1990). The court is not to "weigh" the evidence when evaluating a motion for summary judgment. *See Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 389 (Tenn. 1986).

*Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn.1993).

No presumption of correctness attaches to decisions granting summary judgment because they involve only questions of law. On appeal, the reviewing court must make a fresh determination whether the requirements of Tennessee Rule of Appellate Procedure 56 have been met. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42 (Tenn.Ct.App.1993).

As a Utility District organized pursuant to statute, Harpeth Valley Utilities District of Davidson and Williamson Counties is authorized by Tennessee Code Annotated section 7-82-304(6) to fix, maintain, collect and revise rates and charges for any service. The Utility District set its water and sewer rates based on ". . . the amount of water sold as determined by meter measurement; . . ." This adopted rate structure provides in part:

> 7.(A) Each customer shall pay monthly in accordance with the following rates based on the amount of water sold as determined by meter measurement; provided further that the monthly bill for a multi-unit structure shall be calculated as if each unit were individually metered.

| WATER METERED | | WATER RATE | SEWER RATE |
|---|---|---|---|
| 1,500 gallons or less | | $5.25 | $5.75 |
| Next | 1,500 gallons | 2.21 per 1,000 gal. | 4.56 per 1,000 gal. |
| Next | 1,500 gallons | 2.42 per 1,000 gal. | 4.56 per 1,000 gal. |
| Next | 1,500 gallons | 2.63 per 1,000 gal. | 4.56 per 1,000 gal. |
| Next | 2,000 gallons | 2.84 per 1,000 gal. | 4.56 per 1,000 gal. |
| Next | 2,000 gallons | 3.16 per 1,000 gal. | 4.56 per 1,000 gal. |
| Next | 40,000 gallons | 2.99 per 1,000 gal. | 4.79 per 1,000 gal. |
| Next | 50,000 gallons | 2.76 per 1,000 gal. | 4.79 per 1,000 gal. |
| Next | 400,000 gallons | 2.30 per 1,000 gal. | 4.79 per 1,000 gal. |
| Next | 500,000 gallons | 2.19 per 1,000 gal. | 4.79 per 1,000 gal. |
| Next | 1,000,000 gallons | 1.81 per 1,000 gal. | 3.94 per 1,000 gal. |

(B) All residential sewer service bills for the four (4) billing periods between July 1 and October 31, each year, will automatically have the sewer service charge computed on the winter time, or non-sprinkling period, water consumption, or actual water consumption, whichever is less.

No question is raised in this appeal as to the authority of the Utility District to impose water and sewer rates, nor is any assertion made that the rates charged by the Utility District are excessive. While we are not favored by the trial court with any findings of fact or any specific basis for the grant of summary judgment, the complaints made by Ridgelake may be summarized by the proposition that:

[S]ince water passing through the meter and into its water lines leaked in massive quantities from those lines into the ground, such lost water should not be subject to the sewer rate because it never went into the sanitary sewer system.

Plaintiff bases its complaint primarily on Tennessee Code Annotated section 28-3-302 which provides:

**28-3-302. Collection or reimbursement for underpayments or overpayments — Water or sewer service.** — Notwithstanding any other provision of law to the contrary, if gallonage for water or sewer service or both is inaccurately recorded or registered due to equipment failure and results in the customer being undercharged or overcharged, and the customer is unaware of the error, defect or failure, no utility district, municipality, or water or sewer system or company shall be authorized to collect or assess a charge for the unpaid gallonage or to reimburse the customer for overpayment of such usage, prior to thirty-six (36) months from the date the error is discovered and billed; provided, that if a date certain can be established for such error which is less than thirty-six (36) months, no utility district, municipality, or water or sewer system or company shall be authorized to collect or assess a charge for such usage, or to reimburse the customer for overpayment of such usage, beyond such date. [Acts 1989, ch. 411, § 2.]

The position of the plaintiff is based upon the assumption that the Utility District can charge sewer rates only upon water that actually goes into the sanitary sewer system. No basis exists for such an assertion. Both the water and sewer rates are measured by the amount of water supplied by the Utility District as the gallonage is measured at the water meter where the Utility's water main joins the water supply lines owned by Ridgelake. Theoretically, if there are no leaks in Ridgelake's lines "downstream" of the water meter, all water not consumed by the apartment complex will end up in the sanitary sewer system.

No statute requires the Utility District to measure the water actually going into the sanitary sewer system and measure its rates accordingly. The rate structure adopted by the Utility District states clearly and without ambiguity that both the water rate and the sewer rate are based on ". . . the amount of water sold as determined by meter measurement".

-4-

Ridgelake states its case accurately and succinctly in its brief:

> The gallonage for sewer services was inaccurately recorded or registered. Even the Defendant does not deny this fact. The reason it was inaccurately recorded was because there was an equipment failure which resulted in a leak. As a result of the equipment failure, the gallonage recorded or charged was inaccurate and reflected gallonage that had not returned to the sewer for treatment. In fact the sewer charges are based upon an assumption. No data is available for the customer's inspection to prove or disprove the amount of water that is returned to the sanitary sewer by an individual customer. This has resulted in the overcharging of Ridgelake by $139,465.00. Accordingly, Tennessee Code Annotated § 28-3-302 applies and the Defendant is in violation of the same.

> Ridgelake has not, and is not asserting that they are entitled to a refund of monies associated with the amount of water that went into the meter. Ridgelake is only asserting that the sewer charges were inaccurate due to the leaks. Defendant does not dispute that these leaks occurred. Additionally, Ridgelake has never asserted that they are entitled to any refund outside of the 36 month period immediately preceding the discovery and notification of the overcharge and payment of the same.

In order for this position to be viable, one would have to first assume that the term "equipment failure" as used in Tennessee Code Annotated section 28-3-302 referred to both the water meter and the defective Ridgelake water lines downstream from the water meter. While the statute is inartfully drafted where it states ". . . if gallonage for water or sewer service or both is inaccurately recorded . . . ", the only mechanism for recording gallonage is, in fact, the water meter.

Plaintiff offers no evidence that measuring both water and sewer rates by the amount of gallonage recorded by the water meter is either in violation of law or an unacceptable practice. The affidavit of the expert witness, Mark Parten, offered by Ridgelake is revealing. He states:

> 8.     After this increase was noted, leak detecting services were hired which discovered leaks from Ridgelake's main waterlines. Ultimately these leaks and any other leaks that were discovered in the repair of these main leaks were repaired.

> 9.     Thereafter, as agent for Ridgelake, I sought a refund for sewer charges which had been incurred by Ridgelake on the water which had not returned to the sanitary sewer. The amount of the refund sought was based upon the water consumption after the leaks were repaired as compared to the consumption of water during the time of the leaks.

> 10.     This request on behalf of Ridgelake for a refund was denied by the District's Board of Commissioners at the April 2, 2002 meeting. However, Robert

Parker, attorney for the District admitted to me and Mike Willis of TTC, Inc. that if the plumber's affidavit was accurate that he could agree that the water that leaked from the mains did not return to the sanitary sewer.

11. In my position as a consultant for apartment complexes with respect to their water and wastewater consumption, I have had the opportunity to review dozens of policies from different Utility Districts across the State of Tennessee and the southeast.

12. The methods for billing and refunding monies to customers by Utility Districts in the State of Tennessee are varied.

13. I have reviewed the leak adjustment policy and all other policies attributable to Harpeth Valley Utilities District that have been provided to me by the District in the course and scope of my consulting capacity for Ridgelake.

14. After a review of the leak adjustment policies of Harpeth Valley Utilities District, as compared to other leak adjustment policies from other Utility Districts in the State of Tennessee, their leak adjustment policy is stringent.

15. Ridgelake is an apartment community with over 500 individual apartments. As people move in and out on a continuous basis, Ridgelake experiences fluctuations in their water consumption that would very easily hide what Mr. Barge and Mr. Brown call "unexpected fluctuations."

Mr. Parten speaks only of the "leak adjustment" policy of the Utility District and its alleged "stringent" character. No statute requires the Utility District to adopt any "adjustment policy". More importantly, Plaintiff does not sue for recovery under the "adjustment policy" of the Utility District.

Plaintiff offers neither testimony nor citation of law that prohibits measurement of both water and sewer rates by gallonage recorded at the meter. Ergo, the testimony of Daniel B. Barge, Jr., consulting engineer, is essentially undisputed:

A. Each meter is read to determine the amount of water used by that customer or I should say flowing to that customer during the billing period. If this customer also has a sanitary sewer system, this customer is billed for the sanitary sewage, also. If he does not have, he pays for water only. And I think that's standard for the state of Tennessee.

Q. How do you determine the charge for water that's used?

A. It's based on the rates that are adopted by the management of the system.

Q.    And what are those rates applied to?

A.    What are they applied to?

Q.    Yes, sir.

A.    For a gallon of water.

Q.    And where do you get the gallon of water?

A.    From the reading of the meter.

Q.    All right.  For wastewater, how is it determined that you're billed for wastewater?

A.    You are billed for wastewater based on the amount of water that flows through the meter.

Q.    What if some of the water that flows through the meter doesn't go back into the wastewater system because of a leak in the customer's line?

A.    You're still billed for it.

Q.    Now, is that standard in Tennessee?

A.    Yes.

Q.    Why is that?

A.    Because the utility cannot be responsible for the maintenance of the system that's beyond its meter.

Q.    And is that standard policy based on your years of experience in Tennessee?

A.    Yes.

The Utility District has chosen to measure its rates for both water and sewer services by the gallonage recorded at the meter.  Plaintiff offers neither authority in law nor proof in fact that such policy does not conform to law.  Plaintiff offers no authority that the Utility District may be compelled to either measure waste water as it enters the sewer system or base its waste water charges on such measurements.  Stretching Tennessee Code Annotated section 28-3-302 as far as it may be stretched, leakage downstream of the water meter does not measure anything.  The only equipment by which water or sewer service is ". . . recorded or registered . . ." is the water meter itself.  While

it is obvious that water leaking from defective water lines downstream of the water meter does not enter the sanitary sewer system, it is equally clear that the failure of the water to enter the sanitary sewer system is a result of Ridgelake's failure to properly maintain its own lines.

The "leakage adjustment" policy referred to by Mr. Parten is actually described in the affidavit of Consulting Engineer Barge.

> 8. I am aware of the District's leak adjustment policy for leaks in a customer's water or wastewater utility service lines on the customer's side of the meter. This policy requires a customer to submit a written request for an adjustment for such leaks within ninety (90) days of the due date of the bill for which the adjustment is requested. The District's policy does not permit a customer to allow potable water or untreated wastewater to leak from the customer's lines for lengthy or extended periods of time and then to request a refund for charges paid for the estimated amount of leaked water or wastewater. It is the customer's responsibility to maintain its own water and wastewater service lines and to monitor its bills for unexpected fluctuations in usage and charges. The District's policy with regard to adjustments for leaks is in all respects reasonable and constitutes sound water and wastewater utility management and fiscal responsibility. The District's policy in my opinion is clearly in the public's interest and protects and promotes the public health and environment.

> 9. The District's leak adjustment policy, including its 90-day provision, is typical of such policies adopted by public water and wastewater utilities in Tennessee. In fact, the District's policy might be considered liberal. I have no knowledge of any legal or regulatory requirement that requires a public water and wastewater utilities provider to give refunds for any period of time based upon leaks in the customer's own water or wastewater service lines. Potable water is a precious natural resource, of which there is a limited supply. The District's leak adjustment policy promotes water conservation and encourages its customers to continually monitor their water usage.

Aside from accommodating a customer, the "leak adjustment" policy is of value to the Utility as explained by Mr. Barge.

> Q. Let me ask you this: Do you know of any reason why a public municipality or public utility would even care if water was leaking from a customer's own service line?

> A. Well, yes, I think you'd care because – –

> Q. Why would you care, Mr. Barge?

> A. Well, because it's environmentally offensive.

Q.   All right.  Why is it environmentally offensive?

A.   Because it spreads disease and odors, and it's just not the right thing to do.

Q.   Now, that would be true of a wastewater line of a private customer that was leaking, right?

A.   Yes.

Q.   What about a water line, a potable water line, if it leaked, does a public entity care that produces and serves water to the public?

A.   Well, I think in general they would if it became erosive or a nuisance to somebody, and I also think as an operator and a replenisher of the water, you just hate to see that product wasted.

Q.   Why?

A.   Why?

Q.   Yes, sir.

A.   Because if there were enough wasted, there wouldn't be enough to go around.

Q.   Well, are you suggesting that the public purveyor of water has some responsibility to the rest of the public to have an adequate supply of water at all times?

A.   Yes, I do believe that if you are in the water business and furnishing water, you ought to have an adequate supply of water available to the customer whenever needed.

Q.   All right.  If you would go to paragraph 8 of your Affidavit.

A.   All right.

Q.   If you would, read the third sentence.

A.   The district policy does not permit a customer to allow potable water or untreated wastewater to leak from a customer's line for lengthy or extended periods of time and then to request a refund for charges paid for the estimated amount of leaked water or wastewater.

Q.    Do you believe, based on you experience, that that is a sound policy?

A.    Yes, sir.

Q.    Do you believe that that is the policy that is generally standard by municipalities and public utility districts in the water and wastewater business in Tennessee?

A.    I do.

While one might say that measurement of sewer rates by water meter readings will not be a particularly accurate measurement of what goes into the sewer system, how does one measure the volume of non-liquid waste that goes into the sanitary sewer system from a 500-apartment complex during the same month of the water measurement?

The Utility District has the legislative authority to set rates for water and sewer service. Tenn.Code Ann. § 7-82-304(6). Acting under this legislative authority, the Utility District has chosen to measure its rates for both water and sewer by the number of gallons passing through the water meter. As is the case with solid waste collection, "There is no distinction made in the statutes between the two services relative to the method of assessing costs for the services." *Horton v. Carroll County*, 968 S.W.2d 841, 845 (Tenn.Ct.App.1997). Little authority is cited by either party which addresses the basic question in this lawsuit: what is improper or illegal in using gallonage at the water meter as a basis for calculating sewer charges? Since the statutes give the Utility District the authority to set its rates and no law compels sewer rates to be set by measuring intake at the sanitary sewer system, one is hard put to find a case that has challenged the method by which the Utility has chosen to measure its rates.

Alternatively to its breach of contract claim, Ridgelake asserts "the Defendant is liable to the Ridgelake in *Quantum Meruit* and/or equitable restitution as the Defendant was **unjustly enriched** by charging and receiving payment for sewer services on water which never returned to the sanitary sewer and was therefore not treated by Defendant."

A substantial body of authority holds that *quantum meruit*, quasi contract, and unjust enrichment are equivalent terms for an equitable remedy. *Creative Demos, Inc. v. Wal-Mart Stores, Inc.*, 955 F.Supp. 1032, (S.D.Ind.1997) vacated on other grounds, 142 F.3d 367 (7th Cir. 1998); *In re Estate of Boyd*, 8 P.3d 664 (Idaho 2000); *Esquivel v. Day's Inn of Branson*, 959 S.W.2d 486 (Mo.Ct.App.1998); *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 532 S.E.2d 868 (S.C. 2000).

As only contracts implied in law are creatures of equity, distinction must be made between contracts implied in law and contracts implied in fact. This distinction is made in Tennessee.

Tennessee "recognizes two distinct types of implied contracts; namely, contracts implied in fact and contracts implied in law, commonly referred to as quasi

contracts." *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 53-54, 407 S.W.2d 150, 154 (1966).

Contracts implied in fact arise under circumstances which show mutual intent or assent to contract. *Weatherly v. American Agric. Chem. Co.*, 16 Tenn.App. 613, 65 S.W.2d 592 (1933). Mutual assent and a meeting of the minds cannot be accomplished by the unilateral action of one party. *See Batson v. Pleasant View Util. Dist.*, 592 S.W.2d 578, 582 (Tenn.App.1979). Here, the City's unilateral action in mailing invitations to bid to Angus does not establish mutual assent. No contract between the parties existed until Angus submitted a bid on a project which was accepted by the City. Angus submitted no proof in the record that an invitation to bid constituted mutual assent that Angus would contract with City for the performance on a demolition project. Therefore, Angus failed to present evidence creating a genuine issue regarding a contract implied in fact.

Contracts implied in law are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice. *Weatherly v. American Agr. Chem. Co.*, 16 Tenn.App. 613, 65 S.W.2d 592 (1933). A party seeking to recover on an implied in law or quasi contract theory must prove the following:

> A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

*Paschall's, Inc.* 219 Tenn. at 57, 407 S.W.2d at 155.

*Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn.Ct.App.1997).

Observing in footnote that the unfortunate use of "implied contract" to connote both true ("implied in fact") and quasi ("implied in law") contracts has led to much confusion, the Supreme Court of South Carolina corrected its previous mistake in this respect:

C. Implied by law contract or *quantum meruit*

The Hospital argues that the Court of Appeals should have required respondents to pay the bills under either a theory of *quantum meruit* or contract implied by law. We disagree.

First, we correct a misstatement of law which first appeared in 1981. Prior to our decision in *Piedmont Premium Service, Inc. v. South Carolina Ins. Co.*, 277 S.C. 99, 283 S.E.2d 828 (1981), we used the terms *quantum meruit*, quasi-contract, and contract implied by law as equivalent terms, to distinguish those situations where equity would aid recovery from those where law provided the remedy, that is, express contracts or contracts implied in fact. *See, e.g., United States Rubber Products, Inc. v. Town of Batesburg*, 183 S.C. 49, 190 S.E. 120 (1937); *Rainwater v. Hobeika*, 208

S.C. 433, 38 S.E.2d 495 (1946).  In a law action, the measure of damages is determined by the parties' agreement, while in equity, "the measure of the recovery is the extent of the duty or obligation imposed by law, and is expressed by the amount which the court considers the defendant has been unjustly enriched at the expense of the plaintiff."  *Town of Batesburg*, 190 S.E. at 126.

In *Piedmont Premium, supra,* we erroneously defined a contract implied by law as resting on "a duty imposed by law and treated as a contract for purposes of remedy only."  *Id.*, 283 S.E.2d at 829.  *Piedmont Premium* directly quoted 17 C.J.S. *Contracts* § 4(b) as the source of this definition of a contract implied by law (equitable).  In fact, § 4(b) is a discussion of **implied in fact** (legal) contracts.  We overrule *Piedmont Premium* to the extent it erroneously defines a contract implied by law and return to our original view: *quantum meruit*, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy.

*Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000).

No matter what terms are used to describe the purely equitable remedy provided by quasi contract implied in law, *quantum meruit* and unjust enrichment, this equitable remedy is generally not available if a valid and enforceable written contract governs the subject matter in issue between the parties.  As the Court of Appeals of New York explained:

Turning to plaintiff's cause of action sounding in quasi contract, we conclude that it was properly dismissed.  The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter (*Blanchard v. Blanchard*, 201 N.Y. 134, 138, 94 N.E. 630; *see also*, 66 Am.Jur.2d, Restitution and Implied Contracts, § 6, at 949).  A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment (*Parsa v. State of New York*, 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235; *Farash v. Sykes Datatronics*, 59 N.Y.2d 500, 504, 465 N.Y.S.2d 917, 452 N.E.2d 1245; *Bradkin v. Leverton*, 26 N.Y.2d 192,197, 309 N.Y.S.2d 192, 257 N.E.2d 643; *Smith v. Kirkpatrick*, 305 N.Y. 66, 73, 111 N.E.2d 209; *Grombach Prods. v. Waring*, 293 N.Y. 609, 615, 59 N.E.2d 425; *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337; *see also*, 1 Williston, Contracts § 3A [3d ed]; Calamari and Perillo, Contracts § 1-12, at 19 [2d ed]; 1 Corbin, Contracts § 19).  Indeed, we have stated that: "Quasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort.  The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy * * * Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved*.  The law creates it, regardless of the intention of the parties, to assure a just and equitable result" (*Bradkin v. Leverton*, 26 N.Y.2d, at 196, 309 N.Y.S.2d 192, 257 N.E.2d 425, *supra* [emphasis added]).

*Clark-Fitzpatrick v. Long Island Rail Road Co.*, 516 N.E.2d 190, 193 (N.Y.1987).

Acting on this same line of reasoning and recognizing that equitable remedies are not available where an expressed contract exists, this Court held:

> As we have earlier determined, an express contract existed between plaintiffs and defendants with respect to the payment of maintenance fees in exchange for utilities and services. In this state, no right exists in law or equity which allows a party to abandon an express contract and seek recovery in quantum meruit or under an implied contract theory. In *Fletcher Realty, Inc. v. Hayslope Properties*, 712 S.W.2d 478 (Tenn.App.1986), a realtor sought to avoid the terms of an express agreement regarding commission on the sale of property and to recover on the basis of quantum meruit. This court rejected that claim stating "[i]t is a general rule of law that an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." *Fletcher Realty*, 712 S.W.2d at 481 (citing 66 Am.Jur.2d *Restitution and Implied Contracts* § 6 (1964)). Defendant Lakes Resort/counter-plaintiff filed a counter-complaint, an amended counter-complaint, and a second amended counter-complaint, but it never sought recovery on the basis of an express contract. Instead, counter-plaintiff contended it should be "reimbursed by the lot owners on the basis of unjust enrichment, quasi-contract, quantum meruit, or implied contract."

*Scandlyn v. McDill Coumbus Corp.*, 895 S.W.2d 342, 349 (Tenn.Ct.App.1994).

Recognizing that this equitable remedy, primarily based upon on the inherent inequity of unjust enrichment, cannot be imposed where a valid contract exists on the same subject matter, this Court reversed such an equitable award in *Jaffe v. Bolton*, 817 S.W.2d 19 (Tenn.Ct.App.1991).

The clear prerequisite to any recovery under this equitable remedy is "(1) there must be no existing, enforceable contract between the parties covering the same subject matter, . . ." *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn.Ct.App. 1995).

This equitable remedy is simply not available to Ridgelake under the facts of this case.

Ridgelake further asserts that the billing practices of Harpeth Valley Utilities District are arbitrary and capricious and that its system for charging and billing for sewer services violates the due process rights of its customers, both under the United States Constitution and the Constitution of the State of Tennessee. These general assertions provide no basis for relief. These parties defined their rights and responsibilities by the terms of their bilateral contract. That contract is clear in its terms and in its remedies; and, since it is clear that the water meter was the only instrument of measure provided for in the contract, and there is no error in those measurements, no authority exists for Rideglake's position and, indeed, no relevant authority is cited.

It appears from the record and from argument before this Court that the Utilities District conceded that Ridgelake was entitled to consideration of a refund under the 90-day leak adjustment policy.  Such adjustment may be addressed by the trial court on remand.

The judgment of the trial court is in all respects affirmed, and the case is remanded for such further proceedings as may be necessary.

Costs of the cause are assessed to Appellant.


                        _____
                        WILLIAM B. CAIN, JUDGE