VANDALIA COAL COMPANY ET AL. *v.* UNDERWOOD ET AL.

[No. 8,901.  Filed February 2, 1916.]

1. MINES AND MINERALS.—*Leases.*—*Construction.*—Coal mining leases are in two general classes, those by which the lessee is required to pay the lessor a certain amount of money at stated intervals irrespective of the productiveness of the mine, and those providing for the payment of a royalty on the quantity of mineral mined with a requirement that a stipulated amount be mined within a stated

period of time, and a lease providing for the payment of a stipulated sum on each ton of coal mined, and declaring that in case a certain amount of coal should not be mined the lessees should pay to lessor $600 per annum, was within the latter class. p. 680.

2. MINES AND MINERALS.—*Leases.*—*Construction.*—Where the provisions of a coal mine lease are so ambiguous as to make it impossible to determine therefrom when the payment of the stipulated royalty and rent was to commence, the interpretation placed thereon by the parties early in the life of the lease and prior to litigation, to the effect that the lease was to yield $600 per annum from the date of execution, will be accepted as a practical construction by the parties. p. 681.

3. MINES AND MINERALS.—*Leases.*—*Exploration.*—*Failure to Discover Mineral.*—*Liability of Lessee.*—As a general rule, where a lease is executed for the purpose of exploring for, mining and taking out merchantable mineral and it thereafter appears that no mineral is to be found, the lessee is not charged with the consideration. p. 682.

4. MINES AND MINERALS.—*Leases.*—*Construction.*—Where a mining lease provided that it should continue for fifteen years unless the minable coal in the land should be sooner exhausted, that the lessee should pay a fixed royalty, and, in case the royalty did not reach a minimum sum, should pay that sum per annum, and that the lessee should have the right to abandon the lease at any time on account of the thinness of coal, and authorized the lessee to remove through lessor's land coal found in the adjoining land, and the lessee thereafter opened a mine and exhausted all the coal in lessor's land, the lessee was not liable for the payment of the royalty or the stipulated annual sum after the exhausting of the coal, though there was no formal surrender of the lease prior to the cessation of operations for coal in the adjoining land. p. 682.

From Putnam Circuit Court; *James P. Hughes,* Judge.

Action by James L. Underwood and another against the Vandalia Coal Company and another. From a judgment for plaintiffs, the defendants appeal. *Reversed.*

*Henry W. Moore* and *Davis & Bogart,* for appellants.

*Everett McCullough, H. L. Fisher* and *G. S. Payne,* for appellees

MORAN, J.—Appellees recovered a judgment against appellants in the sum of $433.97, as an an-

·nuity alleged to be due them under a lease executed to appellant, William W. Ray, on a 40-acre tract of real estate in Clay County, Indiana, authorizing the lessee to operate for and mine coal and other minerals. The lease at the time of the commencement of the action was held by appellant, Vandalia Coal Company, by assignment. Many questions are presented on the rulings on the pleadings, but the nature of the same is such that they can be disposed of under the assignments of error questioning the correctness of the conclusions of law rendered by the court on the facts specially found.

The correctness of the conclusions of law involves the construction of the lease, which is the foundation of the action and which is a part of the special findings of fact. The lease was entered into on October 1, 1904, and provides among other things that it was to continue for fifteen years unless the minable coal in the land and adjoining lands should be sooner exhausted, but the annuity was not to be paid after the exhaustion of the coal. The lessee to enter upon the lands and make search for coal within ninety days from the date of the execution of the lease, and if the coal was found in sufficient quantity and quality and the roof of sufficient strength to justify mining, to sink a shaft and have the same completed for operation within six months and from thence to mine coal and pay the lessors for all coal caught on a screen of a certain size, ten cents per ton, to be payable between the fifteenth and twentieth of each month for coal mined during the preceding month. The nut and slack coal to be free of royalty except when worked on mine run basis. The lessee to pay from date to make the royalty amount to $600 annually, or in default, to pay the sum each year after the completion of a shaft or the commencing of mining operations and any sum paid

in excess of royalty on coal mined to be deducted out of any excess over $600 in any year or years thereafter. The annuity not to be payable until after the expiration of one year from the commencement of mining operations. The failure to sink a shaft or begin mining operations within the time stipulated, lessee to pay at the expiration of said time $600 to lessors as advance royalty to be deducted as hereinbefore provided. The lessee reserved the right to abandon the lease at any time on account of the thinness of coal. A failure on the part of lessee to comply with the covenants of the lease was to render the lease null and void.

The controlling question for the decision of the court is the amount of royalty or annuity, if any, that is due the lessors by the terms of the lease and the facts found by the court. On January 16, 1905, a shaft was completed on the land lying immediately east of appellees' land and which was in the same quarter section as that of appellees; all of which quarter section was leased at the same time, for the purpose of operating for and mining coal. This was the only mine opened under the lease, and from this shaft operations were commenced and 751.55 tons of coal mined on appellees' land, for which they received a royalty of $75.15. On November 21, 1905, appellant paid appellees $600 and in October, 1906, an additional $600 as advanced royalty. The court found that on account of the thinness of the vein and the poor quality of the coal in the lands of appellees, coal could not have been mined with ordinary mining facilities during the year of 1906, and in none of the succeeding years up to and including the year 1911, and during these years there was no minable coal in appellees' land, and the term, "minable coal", as used in the lease had reference to coal that could be mined and

marketed at a profit to the operator under ordinary mining and marketing conditions. In June, 1907, appellant ceased mining operations and abandoned the mine in appellees' land, and on December 24, 1907, mining operations ceased as to the entire 160 acres. In January, 1908, appellant removed its personal property from the mine and dismantled the building used in connection with mining operations with the knowledge of appellees. On the facts found by the court of which the above is a brief summary, the conclusion of law was that there was due appellees as unpaid annuity $325 from October 1, 1906, to June 30, 1907, with six per cent interest.

Recurring again to the lease, it will be remembered that it provides that the annuity should not be payable after the exhaustion of coal and that sufficient coal should be mined to make the royalty amount to $600 annually, or in default to pay said sum each year after the completion of a shaft or the commencing of mining operations, and any sum paid in excess of the royalty on coal mined should be treated as advanced royalty to be deducted out of any excess over $600 in any year or years thereafter, with the proviso that the annuity was not to be payable until after the expiration of one year from the completion of the shaft or the commencement of operations on appellees' land. Appellant plants itself on two legal propositions, (1) that when parties enter into an agreement in regard to a thing, which, unknown to both parties, is nonexistent at the time, the mistake avoids the contract, as the thing agreed upon ceased to be possible before the agreement was made; there being no subject-matter, there could be no contract in reference thereto; (2) the lessee in a lease of the character under consideration determines whether the minable coal is exhausted, or the condition of the same renders operation unprof-

itable, and that a surrender or termination of the lease is not necessary in order to resist payment of rent or royalty, on the ground that it had not accrued by reason of the nonexistence of minable coal; that the contract is based on a royalty, and that a recovery can be had under the same only on the theory that minable coal existed. On the other hand, it is appellees' contention that under the lease, appellant was liable for the rent or royalty so long as it held under the lease and that it is no defence to the collection of the minimum rent or royalty that the mine became unprofitable. Appellant and appellees use the words "rent", "royalty" and "annuity" interchangeably.

The coal industry, however, seems to recognize two general classes of mining leases, (1) the lease which requires the lessee to pay the lessor a certain amount of money at stated intervals as a "dead rent", irrespective of the productiveness of the mine; (2) the payment of royalty on the quantity of mineral mined, with the requirement that a stipulated amount be mined within a stated period of time, or upon failure to do so to pay a certain amount of money equal to the income that would have been received by the landowner had the mineral been mined. *Ridgely* v. *Conewago Iron Co.* (1893), 53 Fed. 988; *Muhlenberg* v. *Henning* (1887), 116 Pa. St. 138, 9 Atl. 144; *Diamond Iron Min. Co.* v. *Buckeye Iron Min. Co.* (1897), 70 Minn. 500, 73 N. W. 507. The lease in this case must be considered in the light of the authorities as falling within the class that is based upon a royalty; the consideration to the landowner was a stipulated sum on each ton mined, the minimum production not to yield less than $600 per annum, with provisions for a like sum per annum for failure to mine. This leaves for consideration the

period for which the royalty should be paid under the facts specially found.

The quantity of coal mined, it will be noticed, did not at the fixed royalty produce the minimum rental per annum, as provided by the lease, hence it need not receive further attention; as it was held by this court in *Vandalia Coal Co.* v. *Underwood* (1913), 55 Ind. App. 91, 101 N. E. 1047, that in a lease identical with the one under consideration and on real estate adjoining appellees' that where the royalty per ton on coal actually mined did not produce the minimum royalty in any one year, the payment of the minimum royalty of $600 was required, together with the royalty per ton on the coal actually mined during that year, and the lessee could obtain credit under such circumstances for the excess paid only in a subsequent year, where the royalty per ton produced an excess over $600, and when it did, the excess over $600 paid in the previous year should be credited to the lessee.

This lease bears date of October 1, 1904, and provides that the lessee

"agrees to pay from date to make the royalty thereon amount to $600 annually, or in default thereof, to pay such sum each year after the completion of shaft or the commencing of mining operations, and any sum paid in excess of royalty on coal mined shall be deducted out of any excess over $600 in any year or years thereafter. * * * Said annuity shall not be payable until after the expiration of one year from the completion of a shaft or the commencement of mining operations in said land * * * upon failure of said second party to sink said shaft or begin mining operations within the time heretofore stipulated, said second party agrees to pay at the expiration of said time the sum of $600 to first parties

as advanced royalty to be deducted as herein-
before provided.''

The foregoing provisions of the lease are so ambig-
uous as to make it impossible from the language of
the lease to determine from what date the royalty
of $600 was to commence. Within a short time after
the first year had elapsed from the execution of the
lease, and much less than a year from the completion
of the shaft appellant paid appellees $600, hence
the interpretation placed on the lease by the parties
early in the life of the same and before any litigation
arose is entitled under the circumstances to great
weight, and will be treated by the court as a con-
struction placed thereon that the lease was to yield
$600 to the lessors from the date of the execution.
*Scott* v. *Lafayette Gas Co.* (1908), 42 Ind. App. 614,
86 N. E. 495.

It may be stated generally that a lease executed
for the purpose of exploring for, mining and taking
out merchantable mineral presupposes the exist-
ence of the same, and upon its appearing that
no such mineral is to be found the purpose of
the lease fails. A lease of this character im-
plies that the mineral required to be mined
exists in minable quantities and when it does
not the scheme fails, and the lessee should not
be charged with the consideration. *Blake* v. *Lobb's
Estate* (1896), 110 Mich. 608, 68 N. W. 427; *Dia-
mond Iron Min. Co.* v. *Buckeye Iron Min. Co.,
supra; McCahan* v. *Wharton* (1888), 121 Pa. St.
424, 15 Atl. 615; *Timlin* v. *Brown* (1893), 158 Pa.
St. 606, 28 Atl. 236; *Muhlenberg* v. *Henning, supra;
Gribben* v. *Atkinson* (1887), 64 Mich. 651, 31 N. W.
570; *Colorado Fuel, etc., Co.* v. *Pryor* (1898), 25
Colo. 540, 57 Pac. 51; *Hiller* v. *Ray* (1910), 59 Fla.
285, 52 South. 623, 20 Ann. Cas. 1162. In *Diamond
Iron Min. Co.* v. *Buckeye Iron Min. Co., supra*, in

construing a lease similar in many respects to the lease here under consideration, it was held that the mere fact that the leased premises proved to be less valuable than supposed, or the nonexistence of things which were matters of inducement to the execution of the contract was no defence to an action for rent, but added, "The case is entirely different where the thing contracted for, and which constituted the subject-matter of the contract, had no existence. * * * The very covenant which provides for the payment of a minimum royalty also provides for giving the defendant credit on the output of subsequent years for the amount previously paid in excess of the quantity actually mined. It seems to us that this provision for credit of advance royalties is based on the assumption that there was ore which the defendant might have raised during such prior year or years. Otherwise expressed, this covenant is not one to pay royalty, whether ore exists or not, but to pay royalty, if ore exists whether it is mined or not." In *Colorado Fuel, etc., Co.* v. *Pryor, supra,* 549, the court, in construing a lease executed for coal purposes, said, "By the transaction the lessor expected to receive compensation in the way of royalty, and the lessee profits from the operation of the leased premises as a coal mine; so that the benefits thus realized would be mutual. Unless coal was found of a merchantable grade which could be produced at a reasonable profit, or if that discovered was valueless, to require the lessee to mine it and pay royalty on the production would impose a burden without any benefit in return. * * * unless coal actually existed on the premises of a merchantable grade, which could be produced at a reasonable profit, or, if none existed, or that which was found was valueless, then, under this contract of lease, it would be under no such

obligation." In *Muhlenberg* v. *Henning, supra,* the supreme court of Pennsylvania held that it was the duty of the lessee to search for and find the mineral, and if found in sufficient quantity· and of proper quality, the amount to produce. the minimum stipulated royalty would have to be raised, and failing to do so, the minimum royalty per year would have to be paid. In *Timlin* v. *Brown, supra,* a distinction is made between a lease of a workable and a marketable mine and a lease to explore for minerals; as to the workable and marketable mine the only element of uncertainty was the quantity of the mineral and the lessee took the risk by· the unqualified covenant to pay a fixed minimum royalty. In this connection it was said, "There is nothing in the contract indicating any intention to modify or relieve the defendants from their absolute obligation to pay on the contingencies of the mine proving unprofitable, or of exhaustion of the coal before the end of the term * * * . This is not the case of parties dealing under a mutual mistake as to the existence of the subject of a contract, where afterwards it was proved to have had no existence." The·lease under consideration differs from the lease in that case in that the term of existence of the lease in the case at bar is fifteen years, unless minable coal be sooner exhausted, and the annuity was not to be payable after the exhaustion of the coal. In *McCahan* v. *Wharton, supra,* a contract was for the purpose of mining ore, and when found in sufficient quantity to justify shipping, the royalty not to be less than fifteen cents per ton on 2,500 tons each year, and it was held to be a good defence to the demand for the annual minimum royalty that sufficient ore to justify digging and shipping was not found, holding that the manifest intention of the parties was to make the liability subject to the contingency of finding a sufficient

quantity to justify shipping. "When, therefore, by the terms of the lease, or the circumstances, it is apparent that the existence of mineral is to be determined by the operation under the lease, then the non-existence- or subsequent exhaustion of the mineral terminates the lessee's liabilities thereunder." 1 Barringer & Adams, Mining 89. It was held in *Ellis* v. *Cricket Coal Co.* (1914), 166 Iowa 656, 148 N. W. 887, where the lease was to continue for a period of twenty years or until all the merchantable and minable coal had been exhausted, that the lessee undertook only to mine until the minable coal was taken from the land, and when the coal had been removed, the contract was at an end. To the same effect is *Bannon* v. *Graeff* (1898), 186 Pa. St. 648, 40 Atl. 805.

After coal had been exhausted on appellees' land, the lessee was not bound to surrender the lease formally, for the lease gave appellant the right to remove through appellees' land, free of charge, mineral found on adjoining land, and from January 1, 1906, the time that the coal was found to have been exhausted in appellees' land, up until it was found that coal was exhausted in the whole quarter section, and an abandonment of the entire tract, we do not think that appellant could be held liable for royalty on coal that did not exist in appellees' land, by reason of the provisions of the lease. It, therefore, follows that appellant was liable only for the royalty of $600 per annum from October 1, 1904, the date of the lease, to January 1, 1906, the date when coal was found by the court to have been exhausted on appellees' land, and the court erred against appellant in stating its conclusions of law.

The state of the issues is such that the ends of justice will best be subserved by the granting of a new trial. Judgment reversed with instructions to

the trial court to grant a new trial, and for further procedure not inconsistent with this opinion.

NOTE.—Reported in 111 N. E. 329. As to leases and licenses under law of mines, see 91 Am. St. 881. See, also, under (1) 27 Cyc 710, 712; (2) 9 Cyc 588; 27 Cyc 715; (3) 27 Cyc 719; (4) 27 Cyc 718-720.