**CARL CLEAR COAL CORPORATION, Plaintiff–Appellee,**

v.

**Joe HUDDLESTON, Commissioner, Department of Revenue, State of Tennessee, Defendant–Appellant.**

Court of Appeals of Tennessee, Eastern Section.

Dec. 8, 1992.

Permission to Appeal Denied by Supreme Court March 22, 1993.

Charles W. Burson, Atty. Gen., and William E. Young, Asst. Atty. Gen., Nashville, for defendant-appellant.

David L. Buuck, with Claiborne, Davis, Buuck & Hurley, Knoxville, for plaintiff-appellee.

## OPINION

SANDERS, Presiding Judge (Eastern Section).

The Defendant Commissioner has appealed from a summary judgment for the Plaintiff holding it was not the intent of the legislature for the Commissioner to use the purchase price paid by the mining operator as royalties to the owner of the coal as the basis for determining the value of "property used" pursuant to T.C.A. § 67–4–906(a)(1), (3)(A).

Plaintiff–Appellee Carl Clear Coal Corporation (Clear Coal) filed suit pursuant to T.C.A. § 67–1–1801(a)(1)(B) against the Commissioner of the Department of Revenue for the State of Tennessee (Commissioner) to have an assessment for franchise taxes for the years 1985, 1986, and 1987, in the amount of $29,087, plus interest of $13,612, set aside and abated. The complaint alleged the purchase price it had paid for coal to the owners of the coal as royalties was wrongfully treated by the Commissioner for franchise tax purposes as "rents paid" to the owners of the coal. The complaint stated: "Plaintiff avers that the assessment and the basis therefor are in error and submits that the royalties paid are not for rents, but are for the removal of minerals from the ground which constitutes a severance of the real property interest of the landowner depleting the estate and the value thereof. For this reason, the plaintiff avers that the assessment is in error and should be abated."

The Commissioner, for answer, joined issue on the allegations in the complaint. As pertinent here, he said: "The Commissioner affirmatively states that a substantial portion of the tax assessment in question arose from the Department of Revenue's reclassification of mineral royalties received [paid] by plaintiff as rental payments for the purpose of establishing the plaintiff's liability for the Tennessee Franchise Tax, codified at T.C.A. 67–4–901, et seq."

The Plaintiff and Defendant each filed a motion for summary judgment, each alleging there was no genuine issue of any material fact and he was entitled to a judgment as a matter of law. After both of the parties filed briefs in support of their respective positions, the chancellor sustained the motion of the Plaintiff and dismissed the motion of the Defendant.

The Commissioner has appealed, saying, in effect, it was error for the court to grant summary judgment for the Plaintiff instead of the Defendant. We cannot agree, and affirm for the reasons hereinafter set forth.

The statute under which the Commissioner levied the assessment is T.C.A. § 67–4–906(a)(1), (3)(A). As pertinent here, T.C.A. 67–4–906 provides:

(a)(1) The measure of the tax hereby imposed shall in no case be less than the actual value of the property owned, or property used, in Tennessee.

\* \* \* \* \* \*

(3) In cases where part or all of the property is rented, the actual value of property will be deemed to be the book value of all property owned as shown by the books and records of such corporation at the close of its last fiscal year preceding the making of the sworn report hereinafter required (excepting books with respect to investment costs kept pursuant to regulations of the interstate commerce commission), plus the value of the rental property used which shall be determined by multiplying the net annual rental by the following multiples:

| | | Multiples |
|---|---|---|
| (A) | Real property | 8 |
| (B) | Machinery and equipment used in manufacturing and processing | 3 |
| (C) | Furniture, office machinery and equipment | 2 |
| (D) | Delivery of mobile equipment | 1 |

(4) The "net annual rental" means the gross annual rental paid by the taxpayer, less the gross rental received by the taxpayer for sub-rental.

(5) For the purposes of this section, "used" means only such property as is actually utilized by the corporation in the conduct of its principal business.

The portion of the statute which is the basis of the issue before us is that portion of (3) which provides "the value of the rental property used which shall be determined by multiplying the net annual rental by the following multiples: (A) Real property ... Multiples 8."

The assessments of franchise taxes are for the years 1985, 1986, and 1987. The record shows that in 1985 Clear Coal had in effect one mining lease with Energy, Inc., et al., for the full year and one with Howard Easley, et al., from and after August 20. In 1986 it had the same two mining leases in effect and a third lease, the Francis Richardson, et al., lease, which was in effect for 20 days in the month of December. In 1987 it had the same mining leases in effect, plus a lease with James Spur, Inc., for the last six months of the year and one with J.C. Rice, et al., from June 23 to the end of the year.

Each of the mining leases gave Clear Coal the right to extract coal from the soil for which it was to pay a sum for each ton of coal extracted from the soil, a price ranging from $0.50 up to $6.00 for each ton of coal taken. Two of the leases provided for payment of a given amount per ton or 10% of the sales price, whichever was greater. The following is quoted from the Francis Richardson lease but is representative of what and how the compensation for coal extracted was to be paid: "The Lessee shall pay to the Lessors for all coal mined and removed from the leased premises herein by the strip and auger mining processes, the sum of $2.00 per ton of 2,000 pounds of coal, with weigh tickets to be provided with royalty payments, said payments to be made as follows: Tonnage payments shall be due and payable monthly on the tenth (10th) day of each month. The amount payable on the tenth (10th) day of

each month shall be equal to the tons of coal mined from the first (1st) day through and including the last day of the preceeding month." The lease also provides: "The Lessors shall be liable for the taxes assessed against the land the minerals in place. The Lessee shall be responsible and liable for all other taxes, assessments, and charges of any kind or character against the property, equipment, severed minerals, the severance of minerals and any other charges attributable to the mining operations of the Lessee on the premises." This has reference to the Tennessee "Coal Severance Tax" pursuant to T.C.A. § 67-7-101, et seq., which imposes a tax of $0.20 per ton on all coal products at the time of their severance from the ground.

The mining leases made no rental charge for the use of the land. They provided only for the purchase price of the coal extracted from the ground. Since none of the mining leases called for a monthly or annual amount of rent to be paid on which he could calculate "the gross annual rent paid" as provided in (3) and (4) of the statute, the Commissioner apparently decided to take the total annual purchase price which Clear Coal paid to the owners of the coal interest and call it "rent paid" for the purpose of forming a tax base pursuant to (3) and (4) of the statute. From the copy of the assessment in the record, it appears the field auditor for the Commissioner found that in 1985 Clear Coal had paid $1,527,077.12 for coal extracted from the ground under the two mining leases it had at that time. The auditor then, under the guise of this being the amount of rent paid, multiplied the $1,527,077.12 by eight (8) and came up with a figure of $12,216,617 as the value of the property used by Clear Coal in 1985. In 1986 Clear Coal apparently paid $745,132.37 for coal extracted from the ground. On the theory this was rent, the auditor multiplied this figures by eight (8) and came up with a value of property used, which was three mining leases, in 1986 of $5,961,059. In 1987 Clear Coal apparently paid $152,573.25 for coal extracted under its five mining leases. Again, multiplying this figure by eight (8), the auditor came up

with a value of $1,220,586 as the value of property used by Clear Coal in 1987. In spite of the fact that the number of mining leases involved increased from two in 1985 to five in 1987, under the Commissioner's formula for fixing value of property used, the value dropped from over $12,000,000 in 1985 to approximately $1,200,000 in 1987.

To arrive at the amount of tax to be levied against Clear Coal, the Commissioner used the tax rate of $0.25 on each $100 of value found for property used each year, resulting in a tax of $30,542 for 1985, $14,903 for 1986, and $3,051 for 1987.

The chancellor filed an excellent memorandum opinion in which he stated: "The Legislature clearly intended that the base for the franchise tax was to be based upon the capital invested by the corporation. A plain reading of this is that the tax is upon the capital investment; however, the amount of capital investment 'shall in no instance be less than the actual cash value of the real and tangible personal property owned and or used by such entity within this state.' T.C.A. § 67-4-906. The Court is of the opinion and is constrained to rule that the intent of the franchise tax statute is to tax that type of property which is normally included in the net worth valuation of a corporation and not upon those types of new goods as are purchased by a corporation and then re-sold, as would be the case with automobiles, coal, widgets, gadgets, etc.

"The Court is very mindful of the fact that once a coal mining operation mines the coal and pays the royalty for it, that it becomes an asset of the corporation and that the coal, if it sits on the yard, is property owned by the corporation and valued for franchise tax purposes. Likewise, once the property is sold, the profit from that sale is carried on the retained earnings of the corporation, thus increasing its net value and also being included in the tax base for the corporation.

"The Court is constrained to find that it is not the legislative intent to include the amount of royalties paid for the extraction of coal in the franchise tax base. The Court finds and does hold that the value of coal extracted under a coal royalty lease is not intended to be included as 'property used' for purposes of T.C.A. § 67-4-906(a)(1)." We concur with the chancellor.

Generally,

A leasehold interest under a mining lease is not regarded as real property for tax purposes, unless, perhaps, the statute classifies mining privileges as realty.

A mining lease carries such possessory rights as are needed for the mining operations, but not that full and exclusive possession obtaining between landlord and tenant of farmlands, or of business or residential property. In other words, possession under a mining lease is limited, an incident to the main purpose of passing to the lessee the minerals on location, and severance of the same, and the termination of such possessory interest is dependent on the termination of the property right in the minerals.

54 Am.Jur.2d, Mines and Minerals, § 126.

We find it difficult, from reading the Appellant's brief, to determine exactly what error he insists the chancellor made other than granting the Appellee's motion for summary judgment. The following is the single issue presented for review: "The issue presented for review is whether the Chancery Court erred in finding that the Commissioner improperly included in calculating the taxpayer Carl Clear's franchise tax base under T.C.A. § 67-4-906(a)(3) *the value of various leases granting Carl Clear the privilege of using real property for the purpose of exploring, extracting and selling coal.*" (Emphasis ours.)

The value of the leases was not an issue in the trial court. The issue in the trial court was whether or not the Commissioner was permitted, pursuant to T.C.A. § 67-4-906(a)(1), (3)(A), to use the amount of purchase price paid for coal by Clear Coal in arriving at the value of the rental property used. Sec. 67-4-906(a)(5) provides: "For the purpose of this Section 'used' means only such property as is actually utilized by the corporation in the conduct of its principal business." Since the "value of the various leases" was not an issue in the trial court, it cannot be considered for the

first time on appeal. *Simpson v. Harper,* 21 Tenn.App. 431, 111 S.W.2d 882 (1937); *Carr v. Wilbanks,* 45 Tenn.App. 372, 324 S.W.2d 786 (1958); *Murphy v. Reynolds,* 31 Tenn.App. 94, 212 S.W.2d 686 (1948); *McDaniel v. Owens,* 39 Tenn.App. 73, 281 S.W.2d 259 (1954); *Thomas v. Noe,* 42 Tenn.App. 234, 301 S.W.2d 391 (1956); *Tops Bar–B–Q, Inc. v. Stringer,* Tenn. App., 582 S.W.2d 756 (1977); *Moran v. City of Knoxville,* Tenn.App., 600 S.W.2d 725 (1979); *Harrison v. Schrader,* Tenn., 569 S.W.2d 822 (1978).

The Appellant fails to cite us to a single authority which would support a holding that the purchase price paid by Clear Coal for the coal it purchased from the mineral owners should be treated as rent for the purpose of arriving at "the value of property used" pursuant to T.C.A. § 67–4–906(a)(1), (3)(A). The Appellant cites *Mullins v. Evans,* 43 Tenn.App. 330, 308 S.W.2d 494 (1957) and *J.M. Huber Corp v. Square Enterprises, Inc.,* 645 S.W.2d 410 (Tenn.App.1982) as supportive of its contention that the purchase price Clear Coal paid to the owners of the mineral rights should be classified as rent. We think the Appellant's reliance in each of these cases is misplaced. Neither of these cases has any application to the issues in the case at bar.

In the *Evans* case, Judge McAmis, the author of the opinion, said: "The primary question in this case is whether royalties for the mining of coal, accruing after death of the lessor, pass as realty to the heirs at law of the lessor or as personalty to the surviving husband." The court simply held, in accordance with the well-settled rule in this jurisdiction, that royalties from minerals which have not been severed from the land belong to the owner of the land. In so holding, the court said:

"By the common law rents under a lease executed by the owner of the fee, so accruing after death, cannot be said to be the goods, chattels, rights, or credits of the deceased, since they are incident to the reversion, and vest in the heir or devisee. In this state, as well as in many other states, this rule is in force; it being said in *Smith v. Thomas,* 14 Lea (82 Tenn.) 324, that there is nothing in our statutes changing the rights of the heir or devisee. *Combs v. Young,* 4 Yerg. (12 Tenn.) 218, 231, 26 Am.Dec. 225; *Rowan v. Riley,* 6 Baxt. (65 Tenn.) 67; note to *Walsh v. Packard,* 165 Mass. 189, 42 N.E. 577, 40 L.R.A., 321." See also *Schmid v. Baum's Home of Flowers, Inc.,* 162 Tenn. 439, 37 S.W.2d 105, 75 A.L.R. 261, expressly holding that, unless severed from the reversion by some act of the lessor, rents accruing after his death are realty and not personalty.

The *Huber Corp.* case involved a declaratory judgment action to have certain mineral rights reserved in a deed declared void as being in violation of the rule against perpetuities. The court held that rent, profits or income from land is equivalent to conveyance of land itself and the right to receive royalty is classified as realty. The case has no relation to the case at bar.

In speaking to the leases here at issue, the Appellant states in its brief: "Each of these contracts do [sic] not require the payment of royalties for extracted mineral by Carl Clear until such minerals are actually mined and removed from the property leased." We agree with this statement and we think it is one of the compelling reasons the purchase price paid for this coal cannot be classified as rent. The cases universally hold that when a product of the land is severed from the land it becomes personalty. The price paid to transfer ownership of personalty is purchase price, not rent.

In *Morris v. Messer,* 156 Tenn. 54, 299 S.W. 782 (1927) the Tennessee Supreme Court was faced with a lease similar to those in the case at bar except it granted the right to drill for oil and gas rather than to mine for coal. The *Morris* court noted the "peculiar character" of these contracts:

Although called leases they vest no title in the lessee to the oil and gas before extraction, and they give to the lessee only a contingent right of possession of the land for the purposes of exploration. "After oil and gas is [sic] found however, the right to retain possession for the purpose of producing becomes a vested

right under the terms of the lease, ... and if the oil or gas is reduced to possession, title thereto as personalty becomes vested in the lessee."

Thus, it is apparent that mining leases and mineral leases, in which the amount of consideration depends on the quantity of coal or other mineral actually extracted from the land, are double faceted in that they exhibit characteristics of both a lease and a sale. The dual nature of these leases was also recognized by this court in *Weatherly v. American Agricultural Chemical Co.*, 16 Tenn.App. 613, 65 S.W.2d 592 (1933). The 20–year lease in Weatherly provided the lessee would pay one dollar per ton for all phosphate ore of a certain grade produced. 16 Tenn.App. at 616, 65 S.W.2d 592. In addition, a minimum annual payment of $2500 was required when no mining was being done, such payment to be applied against any royalties paid later in the year. *Id.* at 617, 65 S.W.2d 592. The lessee in *Weatherly* ultimately discontinued its mining activities because the ore on the property turned out to be of poor quality, but it continued to pay the $2500 minimum. *Id.* at 619, 65 S.W.2d 592. The issue in the case was whether, under the terms of the lease, the lessee was required to mine and remove the entire store of phosphate up to the stipulated grade, regardless of the quality or merchantability of the ore. The *Weatherly* court held that the lessee was not obligated to mine all the ore. 16 Tenn.App. at 628–29, 65 S.W.2d 592. The court reasoned that the parties had contemplated the suspension of mining activities and had consequently stipulated for a "sleeping rent" of $2500 a year as "liquidated damages." *Id.* at 626, 65 S.W.2d 592. *See also Coal Creek Mining & Manufacturing Co. v. Tennessee Coal, Iron & R.R. Co.*, 106 Tenn. 651, 681, 62 S.W. 162, 168 (1900). Like the ·*Morris* court, the *Weatherly* court also discussed the two different faces of the excavation lease:

> It is evident that the parties did not intend that the instrument should operate as a sale of the mineral in the land. Not only did they term it a lease, but they stipulated that the royalties should

be paid after the mining and removal of the rock. Of course, it *was* a sale of such as would be mined and removed, but as to the remainder of the rock, it was not a sale ·unless it should be likewise mined and removed. (Emphasis ours.)

*Id.* at 620, 65 S.W.2d 592.

Because the leases in the case at bar can be construed as leases or as contracts for sale, this court is left in a position where it must choose the interpretation most appropriate in light of the franchise tax statute. The most fundamental guiding principal in this regard is to give effect to the intention or purpose of the legislature as expressed in the statute. *See e.g., Crown Enterprises, Inc. v. Woods*, 557 S.W.2d 491, 493 (Tenn.1977). The determination must also depend in large part upon the particular nature of the business of the taxpayer. *Id.* at 493. In the case at bar, the taxpayer is a dealer of coal. Its sole motivation for entering into a mining lease is to acquire coal for resale. Thus, the leases before the court are, for the purposes of the franchise tax statute, best described as sales contracts, the values of which are determined by the quantity of the goods removed from the land. The minimum royalty payments provided for in some of the agreements are equivalent to liquidated damages for failure on the part of the taxpayer to mine and purchase the agreed minimum tonnage. Thus, for this taxpayer, the consideration for the various leases does not amount to capital expenditure. Rather, the lease payments represent the purchase of inventory—an operating expense which does not constitute a portion of the corporate taxpayer's net worth unless retained in inventory.

Support for this interpretation can be found in cases outside of this jurisdiction. In *Adams v. Riddle*, 233 Ala. 96, 170 So. 343 (1936) the Alabama Supreme Court was concerned with defining the relationship shared by the parties to a mining lease. The court noted that:

> How far mining leases of this character create the relation of vendor and purchaser, and how far the relation of lessor

and lessee in the ordinary sense, has been the subject of much discussion in the courts with quite varying results.... A mining lease, carrying only the possessory rights needed for the mining operations, does not pass the full and exclusive possession obtaining between landlord and tenant of farmlands, or of business or residence property. The possession under the mining lease is limited, an incident to the *main* purpose, that of passing to the lessee the minerals on location and the severance of the same. (Emphasis added.)

*Id.* 170 So. at 344–45.

The *Adams* court reasoned that the primary purpose of a mining lease was to accomplish a sale of minerals. The court therefore held that an unlawful detainer action did not lie because the relationship of the parties to the lease was not one of lessor and lessee, but rather of buyer and seller.

In *Miller v. Carr*, 137 Fla. 114, 188 So. 103 (1939) the Florida Supreme Court considered whether a royalty interest in oil property was an interest in land and therefore subject to the statute of frauds. In concluding the royalty interest was in fact personalty and not realty, the court explained:

The lease ... did not give to the lessee the exclusive possession of the entire tract of land therein described, but only the right of ingress and egress over the same while engaged in moving therefrom the oil and gas. When the oil or gas was taken from the land it was divided, [wherein] the lessee became the owner of seven-eights and [the landowner], under the terms of the lease, became the owner of one-eighth interest in the oil as rents or royalties. The lessee had under the terms of the lease the right and privilege *only* of taking the oil from the land and no other. (Emphasis ours.)

*Id.* 188 So. at 107.

Thus, the Florida Supreme Court acknowledged that the excavation lease before it was executed for no other reason than to convey a right to extract oil from the property. The landowner would then be paid, as in the case at bar, in proportion to the amount of oil taken from the land. It is these circumstances which set mining leases apart from the more typical rental agreements in which the right to exclusive possession of real property is granted at a flat annual or monthly fee.

The mineral lease can be fittingly compared to agricultural leases and other agreements which convey the right to remove raw materials from the land in return for royalty payments. The *Adams* court, *supra*, cited several Florida cases to support this analogy:

This Court has held that growing trees are a part of the land, but the trees lose the character of real estate when severed from the soil. *See Walters v. Sheffield*, 75 Fla. 505, 78 So. 539. Likewise, crude turpentine gum in containers or boxes cut in pine trees in condition to be dipped up is classified as personal property. *See Melrose Mfg. Co. v. Kennedy*, 59 Fla. 312, 51 So. 595. Crops of citrus fruits growing on trees are, in general, part of the realty, but when severed from the trees the fruit becomes personal property. *See Simmons v. Williford*, 60 Fla. 359, 53 So. 452....

*Id.* 188 So. at 106.

In *Logan Coal & Timber Ass'n v. Helvering*, 122 F.2d 848 (3d Cir.1941), the third circuit examined several mineral leases in the context of a federal tax statute. The issue was whether or not royalty payments made to a lessor pursuant to a coal lease should be classified as "rents" and thus exempted from federal surtax since they constituted more than 50% of the taxpayer's income. The court held that the payments were not "rents" but rather "royalties" subject to the applicable Revenue Act provisions. The court pointed out that the coal industry recognizes two different types of leases:

"First, the lease which requires the lessee to pay the lessor a certain amount of money at stated intervals as a 'dead rent,' irrespective of the productiveness of the mine; second, the payment of royalty on the quantity of mineral mined, with the requirement that a stipulated

amount be mined within a stated period of time, or, upon failure to do so, to pay a certain amount of money equal to the income that would have been received by the landowner had the mineral been mined." ∴.. " 'royalty' is perhaps the most appropriate word where rental is based upon the quantity of coal or other mineral that is or may be taken from the mine."

*Id.* at 850 (quoting *Vandalia Coal Co. v. Underwood*, 60 Ind.App. 675, 111 N.E. 329, 330 (1916), and *Raynolds v. Hanna*, 55 F. 783, 800 (6th Cir.1893)).

The taxpayer in *Logan Coal* argued that in addition to the right to mine coal the leases granted to the lessees the right to use the surface of the land in connection with their mining operations as well as the right to haul other coal through and under the leased property. The Third Circuit rejected this argument, stating that "[no] separate rental was stipulated for these rights, ... and they, therefore constituted merely an additional consideration for the payment by the lessees of the royalties for the coal mined...." *Id.*

In the case of *Appeal of Duff*, 14 A. 364 (S.Ct.Pa.1888), the pertinent facts are stated, in part, as follows:

A.F. Baum and R.P. Montgomery, being part owners of this tract by an article of agreement with the Sandy Lick Gas, Coal & Coke Co., Limited, undertook and did "lease" said tract of land to said company [as stated in said agreement,] and did further contract with said company that they should have the exclusive right to mine and sell all the merchantable coal in said tract, said company covenanting to open the mines, build shutes, offices, tram-roads, etc., and to pay a royalty of twelve cents per gross ton for all said coal....

After mining operations began, certain litigation arose concerning the operation, and the mining company was ordered to pay the royalty for the coal into court. The court, in making a determination as to the proper distribution of the funds, as pertinent here, said:

"What is the nature of the fund in court? It is contended by counsel for the mortgagor that it is rent, or profit derived from the ordinary use of real estate.... In this view we cannot concur. The agreement ... is not a lease. It is a private sale of the entire mineral in the tract of land for a certain specific price. The fund in court is the price of the mineral. .... While the contract speaks of the price of royalty, it is nevertheless the consideration of purchase money for the coal sold. This coal was part and parcel of the real estate. It was realty, and the price for which it was sold represents realty. It is not rent. It has no element of rent. Rent is an annual profit issuing yearly out of lands and tenements. It never reduces the estate out of which it issues. Royalty, in this contract, is the price of the coal; the purchase money of the land. It is substituted for the land, and it is to be distributed precisely as if the land were sold by ·a judicial decree, and the price brought into court for distribution."

While we have dealt at length with the manner the courts have construed, applied, and interpreted mineral leases, we have only to look at the plain, unambiguous language of the statute itself to find the answer to the issue before us. The statute provides "the value of rental property used which shall be determined by multiplying the net annual rental by the following multiples ... Real property ... Multiples ... 8." "Statutes of taxation are to be strictly construed against the taxing authority, and, therefore, liberally construed in favor of the taxpayer." *Memphis Peabody Corporation v. MacFarland*, 211 Tenn. 384, 365 S.W.2d 40, 42 (1963). "Where there is doubt as to the meaning of a taxing statute, the doubt must be resolved in favor of the taxpayer." *Id.* 365 S.W.2d at 43.

In the case at bar there is no doubt the Commissioner did not comply with the command of the statute, and his assessment is void and of no effect.

The decree of the chancellor is affirmed. The cost of this appeal is taxed to the Appellant and the case is remanded to the

trial court for any further necessary proceedings.

GODDARD and FRANKS, JJ., concur.